UNITED STATES of America,
Plaintiff, Appellee,

v.

Alberto TEJADA, Defendant, Appellant.

UNITED STATES of America,
Plaintiff, Appellee,

v.

Juan Ignacio DIAZ,
Defendant, Appellant.

UNITED STATES of America,
Plaintiff, Appellee,

v.

Geovanne GOMEZ,
Defendant, Appellant.

Nos. 88–2207, 88–2208 and 88–2209.

United States Court of Appeals,
First Circuit.

Heard Aug. 1, 1989.
Decided Oct. 4, 1989.

Edward J. Romano with whom John F. Cicilline, Providence, R.I., John M. Cicilline and Joseph Bevilaqua, Jr., were on brief, for defendants, appellants.

Kenneth P. Madden, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.

TORRUELLA, Circuit Judge.

Alberto Tejada, Juan Ignacio Díaz, and Geovanne Gómez appeal from their convictions after a jury trial in the district court. They were convicted on all counts charged, including conspiracy with intent to distribute and to distribute 500 grams or more of a mixture containing cocaine, pursuant to 21 U.S.C. § 846 and substantive counts of possession with intent to distribute. Tejada also was convicted of distribution of 500 grams or more of a mixture containing cocaine, pursuant to 21 U.S.C. § 841(a) and (b)(1)(B).

A Drug Enforcement Agency ("DEA") informant, Miguel Morel, worked for Tejada. His primary task was to maintain an apartment where cocaine could be stored. On February 28, 1988, Morel, Díaz, and Tejada went to Tejada's own apartment, where Gómez delivered a kilogram of cocaine. Morel and Tejada then took these drugs to Gilbert Colón and Immaculate Arruda, who were indicted separately. Díaz, at a later time, picked up the money still outstanding for the cocaine shipment.

---

* Of the District of Massachusetts, sitting by designation.

On March 3, 1988, Morel set up a meeting between an undercover DEA agent, George Haddock, and Tejada during which Haddock arranged to purchase a half kilogram of cocaine from Tejada. Morel had, earlier that day, seen Tejada weigh out 700 grams of cocaine which Tejada then instructed Morel and Díaz to transport to another rented apartment. Morel and Tejada went to the rented apartment and weighed out 500 of the 700 grams of cocaine, which were then delivered by Morel to the agent. One of Díaz' fingerprints was subsequently found on the bag containing the cocaine. Moreover, Morel had been wired such that all conversations could be overhead by other DEA agents.

There was also evidence that on March 14, 1988, Díaz delivered another kilogram of cocaine to Arruda's home, after arrangements had been made with Tejada. Two days later Díaz and Gómez went to Tejada's apartment. They left with two kilograms of cocaine which were discovered on them at their subsequent arrest. Inside the rented apartment, agents found two kilograms of cocaine. Agents later searched Tejada's apartment and discovered a notebook containing names, dates, and numbers, which the agents believed to be a drug ledger. Arruda testified for the government at trial pursuant to a plea agreement.

Appellants challenge their convictions on five grounds. They allege that testimony concerning pages from the notebook and the notebook itself should have been excluded, that impeachment testimony against Morel should have been admitted, that Morel should have been required to testify in English, and that the second count against Tejada should have been dismissed. We will address these issues in order.

I. *Testimony Concerning Pages from the Notebook*

Appellants argue that the district court erred in admitting testimony by two agents which characterized five pages of the notebook found next to Tejada's apartment as a drug ledger. Their argument, although far from readily intelligible in their brief, appears to rely on Rule 16 of the Federal Rules of Criminal Procedure, as well as an analogous provision in the Omnibus Discovery Order (the "Discovery Order") entered by the court. The relevant section of Rule 16 provides

**Rule 16. Discovery and Inspection.**

**(a) Disclosure of Evidence by the Government.**

(1) Information Subject to Disclosure.

.     .     .     .     .

**(D) Reports of Examinations and Tests.** Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

Similarly, section A(4) of the discovery order requires the government to disclose to defendants "[a]ny reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons."

Prior to trial, the government turned over to defendants the entire ledger. Moreover, the government informed counsel for each of the defendants that two agents would testify as to their interpretation of the meaning of the entries within the notebook. Appellants argue that, even considering the government's actions, they were unprepared to cross-examine these witnesses without the benefit of a report detailing what was to be the agents' testimony.

This argument merits little discussion. The district court overruled defendants' objections, finding that there were no reports or scientific tests or experiments conducted. The agents had prepared solely by

reading through these pages and considering what purpose they might have served. No reports were prepared, nor were summaries made of the documents or of the proposed testimony. Thus, it appears that the rule and discovery order relied upon by appellants is inapplicable because there were no tests or reports.

A court's determination as to compliance with a discovery order is within the court's discretion, and accordingly will not be reversed unless there is an abuse of that discretion. *United States v. Samalot Pérez*, 767 F.2d 1, 4 (1st Cir.1985); *United States v. Richman*, 600 F.2d 286, 292 (1st Cir.1979). These agents testified about their opinion as to the significance of notations within the discovered notebook. It is clearly permissible for properly qualified law enforcement agents to testify about their interpretation of entries in relevant papers or the meaning of coded or slang words. *See, e.g., United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir.1987) (allowing testimony of retired DEA agent as to meaning of coded words in intercepted conversations). "Lay jurors cannot be expected to be familiar with the lexicon of the cocaine community." *Id.* Thus, as we noted in *Hoffman*, many courts have allowed experienced agents to testify as to the interpretation of drug codes and jargon. *See United States v. Carmona*, 858 F.2d 66, 69 (2d Cir.1988); *United States v. Merritt*, 736 F.2d 223, 228 (5th Cir.1984). Agents Roy and Parham, who testified about the meaning of the notations within the ledger, were both veterans with the DEA who had performed investigative and undercover work in numerous cocaine cases. They were well-qualified to issue their opinions as to the meaning of these notations.

Moreover, appellants main objection is based on their purported inability to satisfactorily question the witnesses. The record, however, indicates that both witnesses were extensively questioned during voir dire examinations and that they were then thoroughly and aggressively cross-examined about the alleged drug ledgers. In all, over forty pages of the transcript are devoted exclusively to defense counsels' searching and competent questioning about the agents' interpretations.

Even had defense counsels' inquiry been less impressive, all evidence in the record indicates that the government had provided defendants with all information that they were bound to deliver. The defendants were given the notebook to examine and were informed as to the scope of the testimony by the agents about the relevant pages. No further notice or actions were required.

## II. *Admissibility of the Ledger*

Appellants also argue that the ledger should have been wholly excluded, or at least redacted in part, because it contained evidence of other alleged drug transactions, and therefore it violated Rules 404(b)[1] and 403 of the Federal Rules of Evidence. The trial court held that the ledger was admissible under Rule 404(b) as proof of intent, plan, knowledge, and absence of mistake or accident and that the probative value of the evidence outweighed any potential of unfair prejudice.

The government argues that Rule 404(b) is inapplicable because the ledger was offered as direct evidence of the conspiracy charged, rather than as evidence of "other bad acts." Count one of the indictment read in part:

> *From a time unknown* to the Grand Jury up to and including *on or about March 16, 1988*, in the District of Rhode Island and elsewhere, defendants ALBERTO TEJADA aka ALBERT TEJADA, JUAN IGNACIO DIAZ, and GEOVANNE GOMEZ, did knowingly, intentionally, and willfully combine, conspire, confederate, and agree with each other *and with diverse other persons known*

---

**1.** Rule 404(b) states

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*and unknown* to commit offenses against the United States, that is, to knowingly and intentionally possess with intent to distribute and to distribute 500 grams or more of ... cocaine. (emphasis added).

The ledger referred to numerous dates, all of which were in February or early March 1988. Testimony at trial spoke of drug transactions beginning in February of that year. Thus, the government argues, as the dates within the notebook all fell within the time frame of the conspiracy, the ledger was properly admitted as direct evidence of the conspiracy itself. Also, although other names were listed in the ledger, the conspiracy count acknowledged that the conspiracy included other persons "known and unknown" and testimony at trial supported the same.

█ We find the government's argument persuasive, and therefore conclude that we need not address the district court's conclusion that this evidence would be admissible under 404(b). The ledger is direct evidence of the conspiracy charged and is, therefore, generally admissible. Rule 404(b) is not the only proper avenue for admission of the ledger. Evidence of the crime charged does not need to fall within the exceptions to Rule 404(b) to be admissible. Rule 404(b) applies just to evidence of *other* bad acts or crimes—those other than the crime charged. Where evidence of "bad acts" is direct proof of the crime charged, Rule 404(b) is, of course, inapplicable. *See United States v. Dunn,* 758 F.2d 30, 38 (1st Cir.1985); *United States v. Cerone,* 830 F.2d 938, 948 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988); *United States v. Giraldo,* 822 F.2d 205, 212–13 (2d Cir.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987).

The indictment charges defendants with a continuing conspiracy ending at some time on or about March 16, 1988. All of the dates of possible transactions in the ledger pertain to February or March of that year, within just a six week period. Many of the names in the notebook are nicknames of the defendants or names of witnesses who testified at the trial. The indictment, however, clearly read that other persons were involved and thus, incidents within this time frame with unknown persons still fall within the charge of conspiracy of possession with intent to distribute and distribution of cocaine. Thus, we conclude that Rule 404(b) was inapplicable to the admission of the ledger into evidence because it was admissible as direct evidence of the conspiracy charged.

### III. *Exclusion of Testimony Impeaching Morel*

█ During trial, appellants presented Morel's ex-wife, who they hoped would testify that Morel was not working regularly during the period of the conspiracy. Appellants wanted to use this testimony to impeach Morel's testimony that he had supported his wife and children through gainful employment. Apparently, they intended the jury to infer either that Morel also had been involved in the distribution of cocaine or that he was paid more by the government than he had admitted.[2] The government objected to this proffer pursuant to Federal Rule of Evidence 608(b), which prohibits the introduction of extrinsic evidence to impeach a witness.[3] The court sustained the government's objection to this proffer, as well as to their attempts to question two of Morel's previous employers on similar matters. The court allowed the employers to testify as to the exact dates which Morel had worked but further questioning about his salary history was prohibited.

Appellants argue before us that this testimony did not fall within Rule 608(b) because it was not collateral, but rather directly contradicted Morel's testimony.

---

2. Morel admitted at trial that he was a paid informant and that the government had given him $10,000 for his cooperation in this case.

3. Rule 608(b) provides in part:

(b) *Specific Instances of Conduct*—Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.

This argument attempts to stretch the meaning of Rule 608(b) in such a way that the meaning and the purpose of the rule is lost, besides eradicating clear past precedent on this issue. This rule is essential to enable the effective administration of trials, where the testimony and presentation of evidence must at some point come to an end. Thus, this circuit has in the past been careful to be faithful to the import of the rule. *See United States v. Espinal*, 757 F.2d 423 (1st Cir.1985). As the Fourth Circuit has stated, " 'the interrogator is bound by [the witness'] answers and may not contradict him....' Although the cross-examiner may continue to press the [witness] for an admission, he cannot call other witnesses to prove the misconduct after [the witness'] denial." *United States v. Ling*, 581 F.2d 1118, 1121 (4th Cir.1978) (quoting *United States v. Whiting*, 311 F.2d 191, 196 (4th Cir.1962), *cert. denied*, 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed.2d 766 (1963)).

The factual circumstances underlying the Rule 608(b) issue in *Espinal* are analogous to the facts in this case. In *Espinal*, a government witness and informant had testified that he had never used a different name. Defendants sought to present the testimony of a handwriting expert that the witness had indeed gone by a different name in the past. We upheld the district court's exclusion of this testimony and evidence under Rule 608(b). *Espinal*, 757 F.2d at 425.

The district court in this case was correct in excluding the proffered testimony on Rule 608(b) grounds. The testimony presented during direct examination was intended to contradict Morel's testimony as a government witness. Appellants had to be content with their thorough cross-examination, as the presentation of additional witnesses to contradict these matters is clearly prohibited.

## IV. *Permissibility of Morel's Testimony in Spanish*

Appellants also argue that Morel should have been required to testify during his cross-examination in English, rather than in Spanish with the aid of an interpreter. He had testified before the Grand Jury in English and therefore appellants argue that, as he had demonstrated his English language capability, the jury was unfairly denied the benefit of hearing his answers and judging his credibility by allowing his testimony in Spanish. As defense counsel stated before the district court,

> in the assessment of the credibility of the witness, the jury is entitled not only to listen to what the witness says, but the manner in which he says it. Inflection, tone changes and the like, are all part of the credibility assessment. We lose much of that with the translator—the translator's answers being the answers so to speak.

The district court rejected this argument at trial. The court permitted defense counsel to question Morel in depth about his fluency in English and his testimony before the Grand Jury in English. Moreover, the court carefully instructed the jury as to the witness' use of an interpreter and the importance of not mistaking the interpreter's credibility for that of the witness.

Questions of this sort are wholly within the discretion of the court and will not be overturned absent an abuse of discretion. *See United States v. Kelly*, 722 F.2d 873, 881 (1st Cir.1983) (stating that trial judges have "wide latitude of discretion ... in supervising the conduct of the trial."), *cert. denied*, 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984) (quoting *Walsh v. United States*, 371 F.2d 436, 438 (1st Cir.), *cert. denied*, 387 U.S. 947, 87 S.Ct. 2083, 18 L.Ed.2d 1335 (1967). Morel had testified in English during his direct examination. After being asked on cross-examination to testify in English, Morel agreed and attempted to answer the next three questions in English. The government and the court were concerned that Morel was not understanding the questions and that his answers were not clear. Even the forewoman of the jury informed the court that the jury was having problems understanding Morel when he tried to testify in English. After several more questions in which Morel indicated that he did

not understand, the court instructed the interpreter to begin translations again. It is clear that the court below did not abuse its discretion when it allowed Morel to testify in Spanish with the aid of an interpreter. Indeed, this would have been a much more troubling case had the court in fact required Morel, against his wishes and those of the government and jury, to testify in English.

## V. *Tejada's Second Count*

■ Lastly, Tejada argues that the court below erred in denying his motion for acquittal on Count 2 of the indictment. Tejada argues that Count 2, possession of 500 grams or more of cocaine with intent to distribute on March 3, 1988, should have been merged into Count 3, distribution of 500 grams or more of cocaine on the same day, as both of these allegations relate to the same transaction.

The double jeopardy clause of the constitution "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The test to determine whether two offenses are independent of each other, and thus free from the restrictions of the fifth amendment, was first enunciated by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* Thus, even if much of the same evidence is used to prove the two offenses, as long as each offense requires proof of an element that is not a part of the other, the *Blockburger* test is satisfied. Applying this test, the Supreme Court has concluded that defendant cannot be prosecuted and punished both for a lesser included and greater offense. *Brown v. Ohio*, 432 U.S. 161, 168–69, 97 S.Ct. 2221, 2226–27, 53 L.Ed.2d 187 (1977).

Court of Appeals that have attempted to apply the *Blockburger* test to the offenses of possession with intent to distribute and distribution have traveled different paths in reaching their conclusions. Thus, for example, the Fifth Circuit has held that there is no merger between possession with intent to import and distribution with intent to import where there was distinct and separate evidence for each offense. *United States v. Zabaneh*, 837 F.2d 1249, 1256–57 (5th Cir.1988). The court found that a defendant may be charged with both possession with intent to distribute and distribution "when there is independent evidence of the defendant's prior possession of the controlled substance before the actual time of distribution, or where there is other separate evidence for each offense." *Id.* at 1257. The Eleventh Circuit has adopted a similar approach, holding that "[w]here there is separate evidence of the two offenses, the offenses have not merged." *United States v. Carcaise*, 763 F.2d 1328, 1333 (11th Cir.1985). We followed *Carcaise* quite recently in *United States v. Bernal*, 884 F.2d 1518 (1st Cir.1989) finding there "abundant evidence that Bernal possessed six kilos of cocaine, in his room in the Sánchez residence, after distributing ten kilos to DEA agents. These two batches of cocaine constitute separate evidence of distribution and possession with intent to distribute. The two counts should not, therefore, as a matter of law be merged." At 1522.

In applying the *Blockburger* test more formally, the Sixth Circuit has concluded that possession with intent to distribute is not a lesser included offense of distribution. *United States v. Stevens*, 521 F.2d 334, 337 n. 2 (6th Cir.1975). The court relied on the proscribed punishments available for each offense and also concluded that each offense had a unique element: delivery in the distribution offense and possession in the other. *Id.*

However, the Sixth and other circuits have limited the punishment which can be imposed in certain circumstances when a defendant is convicted of both possession with intent to distribute and distribution. Thus, in *United States v. King*, 521 F.2d 356 (6th Cir.1975) the court concluded that

"where possession of heroin is not shown to exist separately from the moment in which it is transferred to the government agent, but a single act is proof of the two offenses, it was not the intent of Congress that the defendant be punished twice for the single act." *Id.* at 358. *See also United States v. Gómez,* 593 F.2d 210, 214–15 (3d Cir.) (*en banc*), *cert. denied,* 441 U.S. 948, 99 S.Ct. 2172, 60 L.Ed.2d 1052 (1979); *United States v. Oropeza,* 564 F.2d 316, 323–24 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978); *United States v. Atkinson,* 512 F.2d 1235, 1240 (4th Cir.1975).

Upon examining the record in this case, we conclude that the district court was correct in not dismissing Count Two against Tejada. Possession with intent to distribute was not a lesser included offense in this case. We agree with the court in *Stevens* that, although it will be the rare case indeed where this occurs, proof of distribution does not necessarily include the element of possession.

In this case, Tejada had possession of the cocaine on the morning of March 3, during which time he weighed the drugs and had others deliver them to another location where they would later be sold. These facts were clearly sufficient to support the possession with intent to distribute charge. That evening, Tejada had Morel deliver a portion of these drugs to Agent Haddock at a different location. This evidence supports the distribution conviction and is, as was the evidence in *Zabaneh, Carcaise* and *Bernal,* separate and distinct from the evidence of the possession offense. This is not a case in which the distribution itself is the sole evidence supporting the possession with intent charge and is not a case as was *King,* in which possession of cocaine was shown to exist only at the moment of distribution.

*Affirmed.*