[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 03, 2002
THOMAS K. KAHN
CLERK

No. 98-5458

D.C. Docket No. 95-00481-CR-NCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS H. CANO,
DAVID MATOS,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(May 3, 2002)**

Before TJOFLAT and DUBINA, Circuit Judges, and SHAPIRO*, District Judge.

_____
*Honorable Norma L. Shapiro, U.S. District Judge, Eastern District of Pennsylvania, sitting by designation.

TJOFLAT, Circuit Judge:

On August 27, 1997, a Southern District of Florida grand jury returned a seventy-six count indictment against appellants, Luis Cano and David Matos, and eight others. The indictment was the culmination of a lengthy investigation into the operation of a nationwide cocaine trafficking and money laundering network.[1]

---

[1] This was the fourth superceding indictment the grand jury returned against appellants. For convenience, we refer to it as the indictment. Appellant Cano was charged as follows:

Count One: knowingly and intentionally operating a continuing criminal enterprise, from June, 1987 to October 1, 1996, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 848.

Count Two: knowingly and willfully conspiring to posses with intent to distribute a Schedule II controlled substance (cocaine), from February, 1987 to October 1, 1996, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Count Three: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from March, 1995 to May 27, 1995, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Four: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from July 1, 1993 to July 20, 1993, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Five: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from August 3, 1993 to August 28, 1993, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Six: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from September 7, 1993, to September 18, 1993, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Seven: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from December, 1, 1993 to December 13, 1993, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Eight: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from February, 1, 1994 to February 14, 1994, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Cano was charged in all seventy-six counts, and Matos in nine counts. A jury

convicted Cano on sixty-nine counts, Counts 1 to 26, 28-31, 38-76; Matos was

convicted on all nine counts in which he was charged, Counts 2, 4-10, and 12.[2]

The jury based its verdicts, in part, on the testimony of several other members of

Count Nine: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from March, 1, 1994 to March 31, 1994, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Ten: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from April, 10, 1994 to April 28, 1994, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Eleven: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from October, 1 1994 to November 30, 1994, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Twelve: knowingly and willfully possessing with intent to distribute a schedule II controlled substance (cocaine), from January, 1 1995 to January 31, 1995, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Thirteen: knowingly and willfully possessing with intent to distribute a schedule I controlled substance (marijuana), from March, 1 1995 to May 31, 1995, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Fourteen: knowingly and willfully conducting and attempting to conduct financial transactions involving interstate and foreign commerce which the transactions involved the proceeds of a specified unlawful activity, from May, 1989 to October, 1, 1996, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1956(h).

Counts Fifteen to Seventy-Six: sixty-two counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (2).

Appellant Matos was charged with nine counts: Count Two, Counts Four through Ten, and Count Twelve.

[2] By the time appellants' case went to trial, three co-defendants had pled guilty, and five were awaiting trial.

3

the network.[3]

Cano was sentenced to a mandatory life prison term on Count 1, and to concurrent life sentences on Counts 2-13. Additionally, he received a concurrent term of 240 months' imprisonment on Counts 14-26, 28-31, and 38-76. Matos received on each count a concurrent term of 235 months' imprisonment. Cano and Matos now appeal. They seek new trials or, alternatively, re-sentencing on several grounds.[4] Only two grounds merit discussion: (1) whether the district court abused

---

[3] Some of these witnesses testified after pleading guilty to charges contained in separate indictments; a few testified under letter grants of immunity.

[4] Cano claims as follows: (1) Counts 2-13 fail to state an offense; (2) the evidence was insufficient both to establish venue and to convict on Counts 3-6, 8-10, & 12; (3) the district court abused its discretion in permitting Detective Donnelly to "interpret" the "money house" ledgers, and Schery's date book and phone book; (4) misconduct of the prosecutor denied him a fair trial, to-wit: (a) vouching for the credibility of prosecution witnesses on direct examination and during closing argument, (b) staging a "demonstration" in closing argument based on material not in evidence, (c) attempting to have Ruben Carillo refresh his recollection with a ledger maintained by a Colombian, "J.J.," one of Ruben Carillo's lieutenants, and (d) attempting to have Burnbaum recite the facts underlying Wilfredo Schery's previous conviction and to use the facts as substantive evidence; (5) the district court committed plain error in failing to instruct the jury that, to convict the defendant on Count 1, it had to find unanimously that the defendant committed a continuing series of at least three violations of federal narcotics laws; (6) the district court committed plain error under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed2d 435 (2000), in imposing life sentences under 21 U.S.C. § 841(b)(1)(A) on Counts 2-13 because the drug quantities giving rise to the sentences were not alleged in the indictment and found by the jury beyond a reasonable doubt; (7) the court committed plain error under Apprendi, in imposing a life sentence on Count 1, the 21 U.S.C. § 848 offense, because the elements 848(b), which triggered the life sentence, were not alleged in the indictment and found by the jury beyond a reasonable doubt; and, (8) the court committed plain error in failing to group (under the Sentencing Guidelines) the drug-related counts with the money laundering counts in fashioning Cano's sentences.

Appellant Matos claims that: (1) the evidence was insufficient to convict on Counts 4-8;

4

its discretion in permitting a police detective to interpret drug ledgers, a personal phone book and date book seized by New York City Police Department ("NYPD") detectives while conducting searches of the network's facilities in the New York City vicinity; and (2) whether the prosecutor impermissibly vouched for the credibility of government witnesses. We resolve these issues in favor of the Government. We notice plain error on a third issue: whether the record contains any evidence to support Cano's conviction on Count 13, possession with intent to distribute marijuana.

I.

In 1989, Cano and Ruben Carillo, both experienced cocaine traffickers, began distributing large amounts of cocaine. Carillo's sister, Amanda, who had become Cano's mistress, introduced the two men. As it turned out, unbeknownst to them, Cano and Carillo had previously been involved together in the distribution of cocaine in New York City; Cano had been supplying a middleman with multi-

_____

(2) as in Cano's appeal, the evidence failed to establish venue for Counts 4-6, 8-10, & 12;
(3) the court committed plain error under <u>Apprendi</u>, in imposing a term of supervised release in excess of the statutory maximum because the indictment failed to allege drug quantity and the quantity issue was not submitted to the jury. In addition to these claims of error, Matos adopts Cano's points (3) and (4).

   With the exception of Cano's claims 3 and 4(a) (both of which Matos has adopted), which we address in the text <u>infra</u>, none of appellants' claims of error has merit or warrants discussion.

kilograms of cocaine, often in excess of 100 kilos, and the middleman, in turn, had been allocating portions of the shipments to Carillo.[5]  When the middleman learned that  Cano and Carillo had become aware of their respective roles in the distribution network, he quit supplying Carillo.  Carillo solved this supply problem by arranging for a Colombian source, "Potato," to supply him and Cano with cocaine.

New York City was the primary destination for Cano's shipments.  Cano maintained two houses in the New York City vicinity: a "money house" where all the cash was held and the bookkeeping for the operation took place, and a "stash house" where the cocaine was stored.  Claudia Valencia was the operation's bookkeeper and lived and worked in the "money house;" she prepared the ledgers, which were eventually seized by the police during a search and introduced into evidence at trial.[6]  Cano and Carillo had a family reside in the "stash house" in an effort to curb any suspicion about the activities taking place there.

Ruben Carillo supervised the distribution of drugs in the New York City area by telephone from Colombia, where he stayed from 1991 to 1994 to secure the needed cocaine supply.  In effect, Carillo was the vice president of Cano's

---

[5]  Ruben Carillo was indicted in a separate case, pled guilty, and became the principal prosecution witness at appellants' trial.

[6]  We describe the ledgers at note 9, infra.

operation, with Cano serving as president. Wilfredo Schery, Cano's brother-in-law, supervised the network's operations in the New York area and reported directly to Carillo.[7]

In May 1990, Cano received a 750 kilogram shipment of cocaine from Potato; it was flown to an airstrip near Houston, Texas. Cano, Matos and others met the airplane. The cocaine was off-loaded, taken to a stash house, and subsequently transported by truck to New York City. From the sales that took place there, Cano reaped over $6 million; Carillo received roughly $1.5 million.

From 1992 to April 1994, Cano arranged for regular biweekly shipments – containing 300 to 1,000 kilograms – to New York City. The shipments were made by O.B. Industries, a company Cano had acquired to provide cover for his illicit activities, from its elastics factory in Miami and its facilities in Los Angeles and Texas. The O.B. Industries' facilities in these locations served as Cano's distribution centers;[8] the cocaine was transported to New York City within pallets of elastics. For every shipment to New York City, Cano received $1,000 per kilogram. The shipments sent from the factory in Miami involved over 10,000 kilograms.

---

[7] Schery also kept Cano informed.

[8] O.B. Industries continued to operate its elastics factory after Cano acquired the company. Cano used the company as a front to hide his cocaine distribution.

Meanwhile, the NYPD had maintained an active wiretap on Schery's cellular telephone in the New York City area, and both Cano and Matos were recorded discussing their cocaine trafficking business. The wiretap was supervised by Detective Eugene Donnelly. On April 5, 1994, the NYPD arrested Schery and Valencia and seized, at the "stash house," 297 kilograms of cocaine, and, at the "money house," over $1.2 million and two drug ledgers that were introduced into evidence at appellants' trial.[9] A search of Schery's residence yielded $36,000 in cash, one kilogram of cocaine, and several incriminating documents, all relating to drug transactions. Among these documents were "business cards," including a

---

[9] These were the same ledgers kept by Claudia Valencia, the bookkeeper. They were admitted without objection; thus, their admission is not an issue on appeal. The ledgers, containing several pages, cover the periods "February 1 through April 5" and "July 13 through February 4." The undisputed evidence is that the first period was in 1994; the second was in 1994-95. The ledger sheet for February 1-24, 1994, reading from left to right, contains columns with the following headings:

"February" "Vienen" "Macua" "Gallo" "Homie" "Wolf" "Nicky" "Kiko" "Family" "Recibido" "Entregado" "Balance"

Under the headings "February," "Vienen," "Macua," and "Balance" are the following entries for "Macua" on February 1:

"Feb 01" "Pago Telefonos" [under "Vienen"] "1567 "[under "Macua"] --------------------- ------------ "824571 "[under "Balance"]

"01 ""Rent apt. city" [under "Vienen"] "1000 "[under "Macua"] ---------------------------- ------------ "823571 "[under "Balance"]

According to the testimony of several prosecution witnesses, including Ruben Carillo, "Macua" was Ruben Carillo; "Gallo" was Cano.

card for O.B. Industries, "receipts," and Schery's "date book"[10] and "phone book."[11]

Notwithstanding the arrests in New York, Cano kept the network functioning. Among other things, he had Matos spend part of his time in Los Angeles, receiving cocaine at the O.B. Industries facility there and shipping it to New York City. For his efforts, Matos received $100 for every kilogram shipped.

---

[10] The "date book" and the "phone book" are different parts of the same book. However, for convenience we refer to them separately because the prosecution introduced them into evidence as separate exhibits.

The "date book" is a calendar in book form. The pages of the book are divided into blocks representing the days of the month. The blocks are large enough to accommodate several notations. A block for a typical day includes one or more of the following notations: the names of persons who have purchased cocaine from the Cano organization, a code in hieroglyphics representing numbers regarding quantity, money owed or received, or phone numbers.

[11] The phone book is a "Day Runner" with lettered tabs in alphabetical order separating groups of pages. Each tab contains two letters, e.g., AB, CD. On the page to which the tab is attached, ample space is provided to record names, phone numbers, and notations. A typical entry includes the following: a name followed by hieroglyphic numbers (as in the "date book"), and B or P with hieroglyphics. Two of such entries were followed by a number in parenthesis, e.g., (109).

Following the last tab, XYZ, there is a section with lined pages with the heading in the upper left hand corner of each page entitled "NOTES." The words "DIARY/IDEAS" appears directly beneath NOTES. Opposite NOTES to the right is a rectangular box containing this entry: "Subject _____." A handwritten entry appears after "Subject" and over the line in each box, e.g., "Company," "Homey," "Personal," "Personal bills," "House # 1," and "House # 2." On the pages in which "Company" is the subject appear dated hand notes. The dates are in Arabic numerals. Hieroglyphics appear under names written opposite the dates. For example, opposite "12/13" appears "Hernan de Felipe # 54 (50)." Under this entry appear 10 hieroglyphics, the first three of which are closed by a parenthesis, ) . A line beneath that line also has ten hieroglyphics arranged in the same fashion.

In January 1995, with Carillo back in the United States, Cano took on the additional responsibility of transporting his supplier's cocaine from Colombia to the United States. For undertaking this task, he took forty percent in kind of each shipment. In the first month, his workers smuggled 1,100 kilograms of cocaine into Texas from Mexico. His share, 440 kilograms, yielded $7 million. Texas law enforcement officials intercepted and seized the next shipment from Mexico, 2,600 pounds.

In April 1995, Cano's network began to unravel. That month, Cano shipped 150 kilograms of cocaine to Chicago. One of his workers there, Osvaldo Marcial, stored the cocaine. A few days later, Marcial was arrested and jailed on unrelated charges. Cano learned of the arrest but refrained from contacting Marcial at the jail – to determine where he had stashed the cocaine – for fear of being overheard. Instead, he decided to have his attorney, Michael Burnbaum, posing as Marcial's lawyer, visit Marcial at the jail. Burnbaum could have a private conversation with Marcial and find out where he had stored the cocaine. Cano had confidence in Burnbaum's ability to do this because Burnbaum had been an Assistant United States Attorney.[12] Unbeknownst to Burnbaum (and Cano), however, Marcial was

_____

[12] Burnbaum had been an assistant in the United States Attorney's office in the Southern District of Florida and had handled scores of drug cases.

cooperating with law enforcement and, after Burnbaum met him at the jail, he reported the meeting to the authorities. The intelligence Marcial provided law enforcement led to several arrests – including the arrests of Cano, Matos, Burnbaum, and Ruben Carillo.

## II.

## A.

Appellants contend that the district court abused its discretion in permitting Detective Donnelly, the NYPD detective in charge of the case,[13] to decipher, over their objection, what Donnelly and counsel referred to as "hieroglyphics" – symbols contained in the phone book previously introduced into evidence along with the ledgers and date book we have already described.[14] Appellants objected to such deciphering on two grounds: (1) that, under Rule 702 of the Federal Rules of Evidence,[15] the deciphering constituted "expert" testimony by a witness who had

---

[13] Donnelly was the case agent. Among other things, he supervised the conduct of the several wiretaps placed on the telephones used by the conspirators, and ran down the tips the monitored conversations yielded.

[14] See supra notes 9, 10 and 11.

[15] Rule 702, Testimony by Experts, states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has

11

not been qualified as an expert; and (2) that the prosecutor had not notified them that Donnelly would be called as an expert witness or provided them with his qualifications and a summary of his testimony, as required by Rule 16 of the Federal Rules of Criminal Procedure.[16]   The prosecutor responded to appellants' objection by representing that Donnelly was not being called as an expert; all he was going to do was decipher the hieroglyphics – by correlating the ten digit telephone numbers of members of the conspiracy (obtained from the wiretaps) with the ten hieroglyphic symbols opposite their names in the phone book.  On the basis of the prosecutor's representation, the court overruled appellants' objection, concluding that Donnelly would not be testifying as an expert witness.

After the court ruled, Donnelly testified as follows.  First, he explained how

---

applied the principles and methods reliably to the facts of the case.

[16]  Rule 16, Discovery and Inspection, states:

(a) Governmental Disclosure of Evidence.
(1) Information Subject to Disclosure.
(E) Expert Witnesses. At the defendant's request, the government shall disclose to the defendant a written summary of testimony the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) of this rule and the defendant complies, the government shall, at the defendant's request, disclose to the defendant a written summary of testimony the government intends to use under Rules 702, 703, or 705 as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subdivision shall describe the witnesses' opinions, the bases and the reasons for those opinions, and the witnesses' qualifications.

he deciphered the hieroglyphics. Using wiretap information, he selected the telephone numbers associated with two of the members of the conspiracy, Homey and MiLagro, whose names appeared in the phone book.[17] Their telephone numbers had ten digits. Looking at the phone book, he found the conspirator's name and aligned the ten digits (contained in the conspirator's phone number) with the hieroglyphic symbols appearing opposite the name; then, going from left to right, he assigned an arabic number to each symbol.[18] When he compared the symbols and phone numbers for these conspirators, he discovered that each symbol represented a specific arabic numeral. In demonstrating how he deciphered the hieroglyphics,[19] Donnelly used a poster board the prosecutor's office had prepared.[20] The board had a line of ten numbers, zero to nine, going left to right. A hieroglyphic symbol, representing a specific arabic numeral, appeared above

---

[17] Homey was identified by Ruben Carillo as the network's best customer in the New York City area. MiLagro was identified by Donnelly as Milagro Tavares, a female who resided in the same geographic area. A conversation in which she had been a party had been intercepted during one of the wiretaps. Homey and Milagro were unindicted co-conspirators.

[18] Consider hypothetically the phone number 017 334-5651. If a delta ,"▲," symbol was the first hieroglyphic (going from left to right), then the delta represented the number "0".

[19] At times, counsel referred to Donnelly's deciphering as "breaking the code."

[20] Defense counsel objected to the poster board being shown to the jury on the ground that the board had been "prepared in anticipation of litigation [i.e., appellants' trial]," meaning that, because someone in the prosecutor's office had prepared it beforehand, it was therefore inadmissible. The court overruled the objection, and appellants do not challenge the ruling here.

13

each numeral.

We agree with the district court that Detective Donnelly's deciphering of the hieroglyphics was not based on "scientific, technical or otherwise specialized knowledge." Therefore, the deciphering did not constitute expert testimony within the meaning of Rule 702, and the court did not abuse its discretion in overruling appellants' Rule 702 objection.[21] We acknowledge that some courts have considered the interpretation of drug ledgers to constitute expert testimony, but in these cases the expert used previously acquired experience or specialized knowledge to interpret the ledger's notations.[22] See e.g., United States v. Ortega,

---

[21] During his appearance on the witness stand, Donnelly did testify about the NYPD's investigation of Cano's network – the wiretaps; the surveillance of network activities; and the searches of the "money house," the "stash house," and Schery's apartment, which yielded the ledgers and Schery's phone book and date book, and which were introduced into evidence. This testimony, however, played no role in the hieroglyphics deciphering appellants are challenging.

[22]Appellants cite the following cases to argue that "Donnelly's deciphering of the telephone codes, explanations of the roles various persons played, and interpretations of the ledgers fall squarely within the domain of what is generally regarded as expert testimony by a law enforcement officer: United States v. Chastain,198 F.3d 1338, 1348 (11th Cir. 1999); United States v. Ortega, 150 F.3d 937, 943 (8th Cir. 1998); United States v. Sanchez-Galvez, 33 F.3d 829, 832 (7th Cir. 1994); United States v. Tejada, 886 F.2d 483, 486-87 (1st Cir. 1989); United States v. Carmona, 858 F.2d 66, 69 (2d Cir. 1988)."

The expert testimony of the United States Customs Agent in Chastain did not involve any interpretations of notebook entries. Instead, the agent testified about "general techniques of drug smugglers" and certain alterations that made an airplane more suitable for smuggling. Chastain, 198 F.3d at 1349. The testimony in Sanchez-Galvez involved generalized expert testimony on the roles and modus operandi of drug dealing operations. Sanchez-Galvez, 33 F.3d at 832. The law enforcement expert in Tejada, as indicated in the above text, testified as to codes found within a notebook based upon his experience and familiarity with the language of the cocaine community. Tejada, 886 F.2d at 486-87. Finally, in Carmona, a detective testified as an expert as to the meaning of the entries in a notebook. Although the court's opinion does not discuss his

14

150 F.3d 937, 943-44 (2d Cir. 1998) (allowing expert testimony of law

enforcement agent as to meaning of coded language based on experience); United

States v. Tejada, 886 F.2d 483, 486 (1st Cir. 1989) (finding admissible the expert

testimony of agents who used their experience with the "lexicon of the cocaine

community" to interpret coded words within a notebook).  Unlike the witnesses in

these cases, Donnelly did not testify as to general drug trafficking techniques,

"code" or "slang" words, or use his experience as a narcotics detective to decipher

the "hieroglyphics."  Donnelly simply took telephone numbers and names from the

---

experience, it directly cites United States v. Nersesian, 824 F.2d 1294, 1307-09 (2d Cir. 1987).
Carmona, 858 F.2d at 69.  In Nersesian, the detective testified that drug slang in wiretap
conversations was wholly based upon his experience:

> [H]e pointed out that caution, pauses, excessive use of pronouns, and the participants'
> apparent knowledge of what they were talking about were indicia that could be relied
> upon in assessing whether a conversation was drug-related. He also identified certain key
> words or phrases used in certain intercepted conversations as narcotics-related. For
> instance, he testified that, depending on the context, words such as cheese, land, room,
> house, car, horse, and stick-shift, could carry a hidden meaning related to narcotics.

Id. at 1307.

In addition to the fact that Donnelly did not testify based on his experience, we note that
our court has recently held that expert and lay testimony, under the Federal Rules of Evidence,
are not mutually exclusive (at least with the pre-amendment Rule 701; Rule 701 was amended in
2000 by adding 701(c) to eliminate confusion between Rules 701 and 702).   In other words, we
stated that lay opinion testimony is not precluded simply because an expert could testify to the
same subject at issue.  See United States v. Novation, 271 F.3d 968, 1008 (11th Cir. 2001).  The
defendants in Novation objected to law enforcement agents testifying about the meaning of
certain code in recorded conversations, based, in part, on their experience.  Id. at 1007.  The
court rejected the "erroneous assumption...that because an expert could provide the type of
testimony at issue, a lay witness cannot.  Our case law is squarely to the contrary."  Id. at 1008.

15

wiretaps and compared them to the same names in Schery's phone book and to the hieroglyphics appearing next to those names.   No scientific, technical or specialized knowledge was required to accomplish this.  In a sense, Donnelly did precisely what the prosecutor invited the jury to do in closing argument; the jurors were asked to perform the same exercise Donnelly had carried out in their presence and break the code themselves.

B.

Appellants contend that, if Donnelly's testimony was not that of an expert, it constituted the opinion testimony of a lay witness but failed to satisfy one of the criteria of Rule 701 of the Federal Rules of Evidence, Opinion Testimony by Lay Witnesses.  The version of Rule 701 in effect at the time of appellants' trial stated:

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is limited
> to those opinions or inferences which are (a) rationally
> based on the perception of the witness and (b) helpful to
> a clear understanding of the witness' testimony or the
> determination of a fact in issue.

Fed. R. Evid. 701 (amended 2000).

The unsatisfied criterion, appellants say, was the requirement that the witness' testimony be "based on the perception of the witness."  Fed. R. Evid. 701(a).

Appellants are right; in deciphering the hieroglyphics, Donnelly did nothing more than call the jurors attention to the fact that the hieroglyphics appearing next to the

16

names of two of the conspirators, Homey and MiLagro, in Schery's phone book represented their  telephone numbers.  For example,"▲" represented the number "0."   Nothing in the inferences Donnelly drew was based on his perception; rather, the inferences were based on facts already in evidence.  As we have observed, Donnelly merely delivered a jury argument from the witness stand.

The problem appellants face is that they did not object to Donnelly's deciphering on this Rule 701 ground.[23]  We therefore review the court's decision to

[23] Appellants face the same failure-to-object problem concerning Donnelly's use of the hieroglyphics and arabic numerals to infer that many of the entries in Schery's phone book and date book represented cocaine transactions.  After Donnelly deciphered the hieroglyphics, the prosecutor asked him to explain the meaning of the asterisks and boxes containing an "X" next to arabic numbers or hieroglyphic symbols in the "Notes" section of Schery's phone book and date book.  Donnelly said that the arabic numbers or symbols next to the asterisks represented quantities of cocaine; the boxes next to symbols represented monies received or owed for sales of cocaine.  On cross-examination, when faced with apparent contradictions in his testimony, Donnelly acknowledged the inconsistencies (admitting, for instance, that some asterisks represented money, not cocaine) but explained that Schery had erred in making some of the entries in the books.  In other words, Donnelly was telling the jury what Schery actually intended to do.  Although Donnelly's responses amounted to rank speculation (about Schery's state of mind and whether the asterisks and boxes concerned cocaine or money), appellants did not object.  Instead, they have complained for the first time on appeal, contending that this testimony constituted expert testimony under Fed. R. Evid.  702, and, alternatively, that the testimony did not satisfy the "perception" criterion of Fed. R. Evid. 701(a).  We review the admission of lay testimony for abuse of discretion.  See United States v. Novation, 271 F.3d 968, 1009 (11th Cir. 2001).

Had appellants objected at the time the prosecutor elicited the testimony, the court would have sustained the objection, since it was not a matter within Donnelly's expertise – and, thus, did not amount to expert testimony – and, moreover, constituted pure speculation.  Donnelly's responses were absolutely harmless, however.  The jury knew that Schery's "business" was distributing cocaine; hence, that the asterisks and boxes dealt with cocaine and money was obvious.  And other evidence in the case well-established the amounts of cocaine being trafficked and the money the trafficking was bringing in.  Assuming that the district court should

17

allow the testimony under a plain error standard. We may vacate appellants' convictions if (1) there was "error," (2) which was "plain," (3) and which affected appellants' "substantial rights." Johnson v. United States, 520 U.S. 461, 466-67, 117 S.Ct. 1544, 1548-49, 137 L.Ed.2d 718 (1997). If these three conditions are met, we may exercise our discretion and remedy the error if the error "seriously affect[s] the fairness, integrity, or public reputation of [the] judicial proceedings." Id. at 467, 117 S.Ct. At 1549 (quoting United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993)). In this case, because the evidence of appellants' guilt was overwhelming, the error did not affect appellants' substantial rights, and we provide no remedy.

III.

Appellants next aver that prosecutors vouched for the credibility of six government witnesses while examining the witnesses on direct and on redirect, and while giving their closing argument. The record hardly contains an objection.[24] In

have struck Donnelly's speculative testimony – because Donnelly lacked (1) the expertise to render his (speculative) opinions under Rule 702, (2) the required "perception" under Rule 701(a), and (3) his speculations lacked any probative value – error did occur and the error was plain, so as to render the court's entertainment of Donnelly's statements an abuse of discretion. We conclude, however, that Donnelly's statements did not affect appellants' substantial rights.

[24] In his brief, Cano states that only three objections were lodged on his behalf. Matos concedes that no objections were made by his counsel. One of Cano's objections was during the testimony of Osvaldo Marcial; two took place during the testimony of Burnbaum. No objections

18

fact, counsel for Matos never objected to the alleged vouching. Despite the paucity of objections in Cano's case and the total absence of objections in Matos' case, however, we give appellants the benefit of the doubt and afford them plenary review. See United States v. Diaz, 190 F.3d 1247, 1254 (11th Cir. 1999) (stating that plenary review is proper because vouching is a mixed question of law and fact).

Five of the six witnesses appellants identify were accomplices who testified for the prosecution after having pled guilty to a charge (in the instant case or a separate case) or under a letter grant of immunity.[25] They were Ruben Carillo, Tania Mohler (Ruben's wife), Michael Burnbaum, Amanda Carillo (Cano's mistress and Carillo's sister), and Michael Stricklin (Cano's worker). The sixth

were made throughout the testimony of Ruben Carillo, Tania Mohler, Amanda Carillo, and Michael Stricklin.

One of Cano's objections, made during Burnbaum's testimony on redirect, was sustained:

> Q. In addition you were advised that if you committed perjury you would be charged with it.
>  A. Absolutely.
> Q. Do you know how many cases I have prosecuted as an Assistant United States Attorney for perjury?
> A. I do not.
> Mr. Diaz [Cano's defense counsel]: Judge, wait, I object to Ms. King's being a witness in this case.
> THE COURT: Sustained.

[25] Immunity was granted to Amanda Carillo and Stricklin by letters signed by the United States Attorney.

witness was Osvaldo Marcial; he had been indicted and intended to plead guilty in

hopes of receiving for his testimony a sentence reduction under Rule 35 of the

Federal Rules of Criminal Procedure. During the direct examination of the

witnesses who had pled guilty and had been sentenced, the prosecutor, as is usually

the case, introduced the plea agreement (if applicable) and had the witness

elaborate on what had transpired. The same was true with the accomplices who

had pled, but had not been sentenced. Likewise with those testifying on a grant of

immunity.[26] The cross-examination was conducted along the usual lines – the

implication being that the witness was lying in order to obtain favorable treatment.

Sometimes the prosecutor, on redirect if it was within the scope of the cross-

examination, brought out the fact that the witness could be charged with perjury or

emphasized that no promises had been made other than those contained in the plea

agreements and letters of immunity (documents which had been introduced into

---

[26] The following is a typical example, occurring during Amanda Carillo's testimony on direct examination, of the alleged vouching:

Q. Have you been told what would happen if you did not tell the truth?
A. Yes.
Q. And what is that?
A. That I could be charged.
Q. Have any promises been made to you, Ms. Carillo?
A. No, none.
Q. Have you been charged as of this date?
A. No, none.

evidence on direct examination).[27]

Appellants also contend that the prosecutor's remarks in closing argument constituted vouching:

> All these cooperating witnesses have come in. We don't come in here and say to you that you should believe Ruben Carillo-Rosales because he is a nice guy, a good guy or any reason such as that.
>
> Ladies and gentlemen, the man came in here, as has every cooperating witness, looking for something; namely a reduction in their sentence.
>
> They have come in here. They have agreed to plead guilty. We have a number of their plea agreements which you will see. They are going to go back [to the jury room].
>
> Take a look at the terms. It is required that these defendants, cooperating witnesses, come in and tell the truth, get on the witness stand and talk to you truthfully or the government can charge them with perjury, we can get them with obstruction of justice, we can do a lot of things.
>
> You are going to hear a lot of talk from the defense about how the government basically gets in bed with these people, how we give them the world, how we don't care if they lie on the witness stand.
>
> Ladies and gentlemen, they are required to tell the truth. Yes, the assessment lies with the United States Government whether to file a motion to reduce their sentence. Defendants can't do it. The Judge can't do it. The United States Government is the only one with the power to do that.

---

[27]The same techniques were used by both the prosecution and defense on Marcial, even though he did not enter into a plea agreement or testify under a grant of immunity.

We review a claim of vouching under a standard set out in United States v.

Castro, 89 F.3d 1443 (11th Cir. 1996). Vouching occurs when:

> "[T]he jury could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility." United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983), cert. denied 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). In applying this test, we look for whether (1) the prosecutor placed the prestige of the government behind the witness by making explicit [personal] assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony. Sims, 719 F.2d at 377.

Castro, 89 F.3d at 1457.

Appellants' claims fail to meet either standard of the test. The prosecutor

only questioned the witnesses regarding the truth-telling portions of their plea

agreement and brought out the fact that the agreements stated they were subject to

perjury. No jury could reasonably believe these types of questions put the prestige

of the government behind each witness or indicated that the prosecutor was

implying there was evidence beyond what was presented to the jury that supported

the witness's testimony. The alleged vouching in the testimony at hand is similar

to the testimony complained of in Castro:

> In this case, the prosecutor merely questioned Gelber about the requirements of the plea agreements to testify fully and truthfully. Furthermore, in his questioning of Gelber, the prosecutor merely pointed out that Gelber risked prosecution if he perjured himself. We have found similar questioning proper. See United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S. Ct. 1304, 79 L.Ed.2d 703 (1984).

22

Castro, 89 F.3d at 1457.

Moreover, we have found it proper for the prosecution to rehabilitate the witness on direct examination if defense counsel attacks the witness's credibility during the opening statement. See United States v. Delgado, 56 F.3d 1357, 1368 (11th Cir.1995). As in Delgado, the record here discloses vitriolic remarks during defense counsel's opening statements concerning the character and credibility of government witnesses, referring to them as "snitches," "criminals," "master[s] of manipulation," and informants with an "axe to grind."

As for the remarks in closing argument, it becomes obvious from a reading of the record that appellants' principal argument to the jury in closing would be that none of these witnesses – continually called "snitches" throughout appellants' closing arguments – were worthy of belief. The evidence of guilt was so overwhelming that attacking these witnesses was about all defense counsel could do. In other words, counsel concentrated on the credibility of these witnesses and ignored the prosecution's other evidence. In fact, in rebuttal argument, the prosecutor invited the jury to disregard the accomplice testimony altogether and to focus on the other evidence, contending that such other evidence was so strong that the jury could convict on it alone.

Even if the prosecutor's questions during examination and remarks at

closing constituted vouching, we hold that they were harmless and did not prejudice any substantial right of the defendants. Consequently, we find that no prosecutorial misconduct occurred with respect to impermissible vouching.

## IV.

Count 13 of the indictment charged Cano with possession with intent to distribute marijuana from March 1 to May 31, 1995. Cano was convicted on that count and the district court sentenced him to life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). Neither the presentence investigation report ("PSI") nor the record of the sentencing hearing established that Cano possessed any quantity of marijuana during that time period. Although Cano's defense counsel did not raise this issue on appeal, and the Government has ignored the point, we review it for plain error.

We find plain error. The absence of any evidence to support the charge constitutes error. The error is plain, affects Cano's substantial rights,[28] and affects the fairness, integrity, and public reputation of the proceeding on Count 13. Cano's conviction on that count is therefore vacated.

---

[28]We note, however, that this does not make any practical difference, since Cano was sentenced to thirteen concurrent life sentences, including the marijuana charge. With Count thirteen vacated, he will serve twelve concurrent life sentences.

24

V.

For the foregoing reasons, the district court's judgment against Cano on Count 13 is VACATED, and the district court is directed to dismiss the count. Appellants' convictions and sentences are otherwise AFFIRMED.

SO ORDERED.