BARKETT, Circuit Judge,
concurring in part, and dissenting in part:
I concur in the majority’s resolution of issues three, four, six, seven, eight, and nine. However, I believe the majority makes three significant errors in this case affecting issues two, five, and ten. First, Agent Kavanaugh was never qualified as an expert and should not have been permitted, as a lay witness, to give his opinion of the evidence in the case, because it was not based on firsthand knowledge and his lay opinion testimony was merely the government’s closing argument in disguise. Permitting a government agent to give his lay opinion based only on the fact that he has investigated the case contravenes both the spirit and the letter of our evidentiary rules and case law. Second, in concluding that Padilla’s Miranda rights had not been violated, the majority ignores clear record evidence that Padilla was “in custody” at the time of any incriminating statements and conduct.[1] Finally, as to Padilla’s sentence, I see no principled basis on which to conclude that the district court reversibly erred in applying the 18 U.S.C. § 3553(a) factors to reach the seventeen and one-half years sentence.
I. Agent Kavanaugh’s Lay Opinion Testimony Was Not Admissible Under Rule 701
In our legal system, it is the jury’s function to weigh the credibility of witnesses, to draw inferences from contradictory evidence, and to reach conclusions about the evidence. See e.g., Brown v. Ala. Dep’t of Transp., 597 F.3d 1160, 1173 (11th Cir.2010); Nesmith v. Alford, 318 F.2d 110, 137 (5th Cir.1963).[2] Generally, witnesses testify to facts of which they have direct knowledge. However, witnesses may give their opinions under two circumstances: either when they have expert knowledge and are qualified under *1106 Federal Rule of Evidence 702 to render such an opinion; or when they have personally experienced an event and therefore have the ability to describe their layperson’s perception of the event that the jury cannot otherwise experience for itself. Such lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness’s sensory and experiential observations that were made as a first-hand witness to a particular event. It includes “the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.” See Fed.R.Evid. 701 advisory committee’s note (2000 Amendments) (quoting Asplundh Mfg. Div. v. Benton Harbor Eng’g, 57 F.3d 1190, 1196 (3d Cir.1995)). Further examples include “a witness’s opinion that a person with whom he had spoken was drunk, or that a car he observed was traveling in excess of a certain speed,” United States v. Marshall, 173 F.3d 1312, 1315 (11th Cir.1999), or a witness’s characterization of a vessel that he personally saw in operation as a “go-fast” boat. United States v. Tinoco, 304 F.3d 1088, 1119 (11th Cir.2002).
To ensure that a witness’s lay opinion puts “the trier of fact in possession of an accurate reproduction of [an] event” and does not “amount to little more than choosing up sides,” Rule 701 permits lay opinion testimony only under certain circumstances. See Fed.R.Evid. 701 advisory committee note (1972 Proposed Rules). The rule provides:
If the witness is not testifying as an expert, the witness’ testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
Fed.R.Evid. 701 (emphasis added). I agree with the majority that subpart (c) does not apply.[3] Thus, the only question is whether Agent Kavanaugh’s opinions were “(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.” Id.
The requirement that lay opinion testimony be “rationally based on the perception of the witness” has been explained as the “familiar requirement of first-hand *1107 knowledge or observation.” See Fed. R.Evid. 701 advisory committee’s note (1972 Proposed Rules) (emphasis added); see also Marshall, 173 F.3d at 1315 (holding that under Rule 701, “the opinion of a lay witness on a matter is admissible only if it is based on first-hand knowledge or observation”). For example, in United States v. Mock, we held that a lay witness’s opinion testimony that she “believed” someone else set two fires was properly excluded under Rule 701 because it was not based on her first-hand knowledge. 523 F.3d 1299, 1303 (11th Cir.2008). Likewise, in Marshall, we held that the testimony of a supervisory DEA agent about the origins of a supply of cocaine was inadmissible because the agent “was not present at any of the meetings between [the drug dealer] and the defendants” and thus he “had no personal knowledge regarding the origin of the cocaine given to him by [the drug dealer]” even though he was investigating the case. 173 F.3d at 1315. When we have permitted witnesses to give their lay opinion about an event, it is because the witnesses personally perceived the events as they occurred, drawing on their sensory and experiential observations. See e.g., United States v. LeCroy, 441 F.3d 914, 926-27 (11th Cir.2006) (holding that the trial court had properly admitted as lay opinion a crime scene specialist’s testimony based on direct observation that a blood stain on a shirt appeared to be caused by someone “wiping a bloody knife off on the shirt”); United States v. Myers, 972 F.2d 1566, 1570, 1577 (11th Cir.1992) (holding that a witness who “saw six pairs of scabbed reddish burn marks approximately two and one half inches apart,” on the victim’s back could give his lay opinion that the “marks on [the victim’s] back were consistent with marks that would be left by a stun gun” because the witness’s “conclusion was rationally based upon his personal perception of [the victim’s] back and his nineteen years of experience[4] on the police force”).
We have rejected the argument that an officer’s lay opinion as to the meaning of facts already in evidence satisfies Rule 701(a)’s personal perception requirement. In United States v. Cano, the lead detective testified that the individual hieroglyphic symbols in a phone book in evidence represented a specific numeral. 289 F.3d 1354, 1360-61 (11th Cir.2002). He testified that based on his comparison of two of the conspirators’ phone numbers to the hieroglyphic symbols, he could break the code used and figure out that each symbol represented a specific numeral. Id. We concluded that this testimony did not satisfy the requirement of Rule 701(a) that testimony be “based on the perception of the witness.” Id. at 1363 (quoting Fed. R.Evid. 701(a)). We explained that the detective “did nothing more than call the jurors attention to the fact that the hieroglyphics appearing next to the names of two of the conspirators ... represented their telephone numbers.” Id. “Nothing in the inferences [the detective] drew was based on his perception; rather, the inferences were based on facts already in evidence.” Id. In other words, the detective’s review of the documentary evidence could not meet the personal perception requirement of Rule 701(a).
This record categorically establishes that Agent Kavanaugh’s opinions were not *1108 based on anything he rationally perceived through “first-hand knowledge or observation.” Agent Kavanaugh testified that his opinions were based solely on his involvement in the case. His assignment consisted of reviewing pre-collected information, including phone calls, facsimiles, financial records and interviews; conducting some additional interviews; identifying which phone calls and facsimiles (“the intercepts”) were pertinent to the investigation; and having those both transferred to an audio cassette and transcribed. Many of the intercepts were in Arabic and required translation into English, which was done by someone other than Agent Kavanaugh, who does not speak or read Arabic.
Prior to Agent Kavanaugh’s testimony, each juror had been provided with binders containing English translations of the 120 intercepts that had been admitted into evidence through another FBI agent. Each transcript contained the date of the phone call, the telephone number of the incoming or outgoing phone call or facsimile, the identity of the participants on the call, and the verbatim transcript of each conversation. All of the phone and facsimile intercepts were either placed from or received at telephone numbers associated with Hassoun or Jayyousi.
After the jurors listened to an individual call that corresponded to a transcript in the binder, Agent Kavanaugh then gave his interpretation and opinion about the meaning of the defendants’ conversations in that transcribed phone call. He pointed out to the jury when he believed the defendants were speaking in code and then gave his opinion of what he thought the conversation and dozens of “code words” actually meant. He not only told the jury that a particular conversation meant something other than what the conversation purported to be about, he also supplied the meaning he believed actually should be attributed to the conversation. However, other than the one or two instances in which the defendants themselves identified the meaning of a code word, Agent Kavanaugh never explained the source of the words and ■ phrases that he claimed were the “true meaning” of the defendants’ words. He merely testified that his opinions about the meaning of the “code” words came from “everything he learned in this investigation.”
But Agent Kavanaugh never explained what knowledge or perception he gained during the investigation that allowed him to interpret the conversations any better than the jury. While no one disputes that Agent ‘ Kavanaugh spent a significant amount of time investigating this case, there is nothing in the record, and the majority fails to identify anything therein, that identifies the specific first-hand experiences and observations from his investigation that would support his lay opinion about the meaning of evidence before the jury. The only specific aspect of his investigation that he identified as the basis for his opinions were the transcripts themselves, which were before the jury. Although he stated generally that he read volumes of documents and interviewed individuals, he never identified anything specific from that investigation that informed his opinions of the actual meaning of the defendants’ conversations.[5]
*1109 The majority’s assertion — that Agent Kavanaugh’s opinions were permissible because they were based on his personal perception of the defendants’ pre-recorded conversations as informed by everything he learned in his investigation — has no support in the law. When we have permitted law enforcement officers to offer their lay opinion about the meaning of conversations, we have required the opinion to be based on more than merely the officer’s knowledge of the particular investigation, contrary to the majority’s conclusion otherwise. A law enforcement officer’s lay opinion about the meaning of a conversation is based on his or her first-hand knowledge when he or she is either (1) a personal participant in a conversation as an undercover agent, or (2) a listener to a conversation while observing a defendants’ behavior in real time to coordinate the conversation with the conduct.
For example, in United States v. Awan, we upheld the admission of an undercover agent’s lay opinion testimony about the meaning of terms involving high finance because the agent “was actually present and participating in the conversation and observing what was happening at the time in terms of gestures and the like of those who are speaking[.]” 966 F.2d 1415, 1430 (11th Cir.1992). In allowing the testimony of the agent, who personally participated in the conversations, we explained that under Rule 701 “[a] witness may clarify conversations that are abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that were clear only to the defendant and the witness.” Id. (citations and internal quotation marks omitted).
The majority’s reliance on Awan to support the admission of Agent Kavanaugh’s testimony is completely misplaced. Unlike the agent in Awan, Agent Kavanaugh was not a personal participant in either the alleged conspiracy or a single conversation about which he opined, elements essential to the admissibility of the testimony in Awan. Not only was the agent in Awan an active participant in the conversations involving the high finance terms he testified about, but he had been undercover for two years posing as a financial consultant and had actually participated with Colombian drug dealers in a highly complex money laundering scheme involving sophisticated banking transactions. Id. at 1417-22. Surely, it cannot be suggested that Agent Kavanaugh’s cold review of transcribed phone calls is remotely similar to the first-hand experiences and observations that the undercover agent in Awan was permitted to opine in his testimony. See also United States v. Davis, 787 F.2d 1501, 1505 (11th Cir.1986) (upholding the admissibility of lay opinion testimony from two government witnesses about the double meaning of a conversation in which each witness was a personal participant).
Likewise in United States v. Novaton, we upheld the admission under Rule 701 of law enforcement agents’ lay opinions that a reference to a “fifteen year old girl” actually referred to fifteen kilograms of cocaine. 271 F.3d 968, 1007 (11th Cir. 2001). We did so because the law enforcement officers conducted real-time video and foot surveillance of the several suspected drug conspirators, while simultaneously listening to their conversations. Id. at 980-81. Thus, the witnesses could confirm that no fifteen-year old girl was present.[6]
*1110 In a case with facts materially indistinguishable from those here, the Eighth Circuit, too, recognized in United States v. Peoples that under Rule 701 a law enforcement officer’s testimony “is admissible as lay opinion only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred.” 250 F.3d 630, 641 (8th Cir.2001) (emphasis added). Like Agent Kavanaugh, the agent in Peoples “did not personally observe the events and activities discussed in the recordings, nor did she hear or observe the conversations as they occurred.” Id. at 640. Instead, the investigation upon which she based her opinion consisted of listening to the recorded calls after the fact, just as Agent Kavanaugh did here. Id. “[A]s the recordings of the [defendants’] conversations were played for the jury, [the agent] was allowed to offer a narrative gloss that consisted almost entirely of her personal opinions of what the conversations meant.” Id. Accordingly, the Peoples court held that the lead case agent’s interpretation of the meaning of pre-recorded and transcribed telephone conversations already before the jury in written form was inadmissible under Rule 701. Id. The same is true of Agent Kavanaugh’s testimony. See also United States v. Garcia, 413 F.3d 201, 212 (2d Cir.2005) (recognizing that an agent who relies on all of the information gathered in an investigation to offer an opinion as to a person’s culpable role in a charged crime “is not presenting the jury with the unique insights of an eyewitness’s personal perceptions,” and therefore, “the investigatory results reviewed by the agent — if admissible — can only be presented to the jury for it to reach its own conclusion”).
The majority also erroneously relies on United States v. Gold, 743 F.2d 800 (11th Cir.1984) and United States v. Hamaker, 455 F.3d 1316 (11th Cir.2006) to conclude that Rule 701 permits a lay witness to offer opinion testimony based solely on his examination of documents that concern activities in which he did not personally participate.
Gold involved the permitted testimony of the president of a large eyewear company that the volume of eyewear sales at another large eyewear company was “excessive.” 743 F.2d at 817. Gold, however, does nothing more than follow the longstanding practice in which “most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.” Fed.R.Evid. 701, advisory committee’s note (2000 Amendments) (emphasis added). The practice of courts in allowing business owners to testify under Rule 701, without undergoing the rigors of Rule 702, exists “because of the particularized knowledge that the witness has by virtue of his or her position in the business.” Id. For us to extend this principle to law enforcement officers would require us to take into consideration an officer’s years of experience in the “business” of law enforcement, which this Circuit has specifically held will run afoul of the limitation of Rule 701(c), see Dulcio, 441 F.3d at 1275, that requires the officer to qualify his testimony under Rule 702, see Garcia, 447 F.3d at 1335; Chastain, 198 F.3d at 1349.
Hamaker is equally inapplicable and does not support the majority’s contention that simply reviewing volumes of business *1111 records satisfies Rule 701(a)’s requirement that a lay witness’s opinion testimony be “rationally based on [his] perception.” The witness in Hamaker was an FBI financial analyst who testified about mathematical computations he performed using data from business records. 455 F.3d at 1330. The court in Hamaker explained that the witness “factually described [the defendant’s] records and then matched a small subset of, the voluminous payroll, accounting, and invoice records.” Id. at 1331 (emphasis added). The only question before the court in Hamaker was whether the witness’s testimony was expert and should have been subject to Rule 702, which the court concluded it was not. Indeed the court in Hamaker summarily concluded that because the witness’s testimony was not expert testimony, it therefore was allowed under Rule 701. It never engaged in any analysis of how á review of business records provides the witness with Rule 701(a)’s necessary first-hand knowledge or experiential observation.
Moreover, allowing a witness to testify about mathematical computations based in data actually in evidence is much different than allowing a witness to invade the jury’s prerogative by choosing among various inferences that could be drawn from evidence and testifying that his inference is the correct one. Hamakeids permission of the application of mathematical computations to existing data does not provide an avenue through Rule 701 for a law enforcement officer to offer opinions’ or inferences about the hidden, coded, or double meaning of the contents of written documents in evidence based only on the evidence itself.
The majority also asserts that Cano is not applicable because Agent Kavanaugh based his opinions on what he learned during his investigation, which included some documents that were not in evidence, unlike the agent in Cano who based his testimony only on facts in evidence. That position fails for two reasons. First, as I have already explained, it is impermissible under Rule 701 for a law enforcement officer to state that his lay opinion is based on “everything he learned in his investigation.” Second, Agent Kavanaugh, just like the witness in Cano, purported to base his opinions on the facts already in evidence, namely the face of the transcripts of the defendants’ many conversations, evidence that was available to the jury in exactly the same format as when Agent Kavanaugh reviewed it. Accordingly, not only is the defendants’ reliance on Cano reasonable, but Cano’s reasoning is directly applicable here.
Given our precedent, there is simply no support for the majority’s conclusion that Agent Kavanaugh’s opinions about the meaning of the defendants’ conversations — which he asserts are based on everything he learned in an investigation that involved reading volumes of documents and conducting interviews — satisfies the first-hand knowledge and personal observation requirements of Rule 701.
Nor was Agent Kavanaugh’s testimony “helpful” within the meaning of the requirements of Rule 701(b). Although testimony is certainly “helpful” when a witness simply agrees with the contentions of one side, that is not the meaning of “helpful” under Rule 701. Lay opinion testimony is not “helpful” for purposes of admissibility under Rule 701 when it does nothing more than give one side’s understanding of the evidence. See Fed.R.Evid. 701 advisory committee’s note (1972 Proposed Rules) (explaining that “meaningless assertions which amount to little more than choosing up sides” are excludable under Rule 701 for lack of helpfulness).
We have concluded that a witness’s testimony about the meaning of facts already before the jury is inadmissible lay opinion specifically because the testimony “merely delivered a jury argument from the wit *1112 ness stand.” Cano, 289 F.3d at 1363. The detective’s testimony in Cano “did precisely what the prosecutor invited the jury to do in closing argument; the jurors were asked to perform the same exercise [the detective] had carried out in their presence and break the code themselves.” Id. at 1362. Here, Agent Kavanaugh’s lay opinions were nothing more than the government’s closing argument in disguise because the jurors were able to review the same transcripts of the pre-recorded telephone conversations and could draw their own conclusions about that evidence.[7] See also United States v. Frazier, 387 F.3d 1244, 1262-63 (11th Cir.2004) (en banc) (explaining that, for purposes of admissibility under Rule 702, expert testimony “generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments”); United States v. Garcia-Ortiz, 528 F.3d 74, 80 (1st Cir.2008) (concluding that a witness’s opinion testimony “about a non-technical subject which was not beyond the purview of the jury” was inadmissible under Rule 701 because “[t]he jury was perfectly capable of drawing its own independent conclusion based on the evidence presented”).
Accordingly, because Agent Kavanaugh’s lay opinion testimony had no basis in any first-hand experiences or observations and merely delivered the government’s position on how the jury should view the evidence before it, his opinion testimony about the meaning of the defendants’ conversations was erroneously admitted under Rule 701.
II. Padilla’s Miranda Rights Were Violated at the Airport
Special Agent Russell Fincher testified to incriminating statements that Padilla made in the FBI interview while detained at O’Hare Airport in Chicago. Although there is no dispute that Padilla did not receive Miranda[8] warnings before making these incriminating statements, the majority concludes that no such warnings were required because Padilla was not “in custody” at the time he made the statements. The record, however, cannot support this contention.
A defendant is “in custody” for Miranda purposes when there “is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.” California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (citation omitted). This test “depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.” Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Thus, “the only relevant inquiry is how a reasonable man in the [defendant’s] position would have understood his situation.” Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In determining whether the defendant was in custody, we “examine all of the circumstances surrounding the interrogation.” J.D.B. v. North Carolina, 564 U.S. -, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011) (citation omitted).[9]
*1113 The majority discounts or ignores several critical facts that, under controlling precedent, compel the conclusion that a reasonable person in Padilla’s position would have felt a “restraint on freedom of movement of the degree associated with a formal arrest,” Beheler, 463 U.S. at 1125, 103 S.Ct. 3517 (citation omitted), and was, accordingly, “in custody.”[10]
Upon his arrival at O’Hare from Pakistan, Padilla proceeded to the customs area for inspection, where he was removed from the general population and subjected to a secondary examination at the direction of the FBI. That secondary examination, which was conducted by a Customs Service inspector, typically involves a pat down, a luggage search, and an inquiry about currency or produce brought into the. United States. During Padilla’s examination, the inspector discovered that Padilla had declared on his customs form that he possessed $8,000 when he actually possessed a little more than $10,000. Because the failure to declare over $10,000 was a violation of the law, the inspector confiscated the money and retained Padilla’s luggage. As a result, any attempt by Padilla to leave the airport following the secondary examination would have required him to abandon both $10,000 and his luggage. Under our precedent, “[retaining luggage] itself is a sufficient restriction on one’s freedom of action so as to trigger the giving of Miranda warnings before proceeding with any interrogation.” United States v. McCain, 556 F.2d 253, 255 (5th Cir.1977).[11]
Following the secondary examination, Padilla was brought to an airport conference room. Although Padilla was not physically restrained, precedent from both the Supreme Court and this Circuit establish that the fact that Padilla was escorted to the conference room — as opposed to going there on his own volition — weighs heavily in favor of finding that he was in custody. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); United States v. Hunerlach, 197 F.3d 1059, 1066 n. 8 (11th Cir.1999); United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir.1987). Indeed, we have explicitly stated that “[a]n officer’s asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave.” United States v. Espinosar-Guerra, 805 F.2d 1502, 1507 (11th Cir. 1986).
Moreover, the conference room to which Padilla was escorted was located in a restricted part of the airport that was not accessible to the public. The Supreme Court has emphasized that “exposure to *1114 public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect’s] fear that, if he does not cooperate, he will be subjected to abuse.” Berkemer, 468 U.S. at 438, 104 S.Ct. 3138. We have similarly emphasized this point. See United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004) (“Instead of being detained in a remote area far from public scrutiny, [the defendant] was stopped in the parking lot of an apartment building in broad daylight. The officers’ actions were visible to anyone in the area who chose to look.”). Not only was the conference room located in a secure part of the airport, but it had no windows through which anyone could peer in. .See United States v. Chavira, 614 F.3d 127, 135 (5th Cir.2010) (emphasizing that “the questioning occurred in a windowless, secured area that was not accessible to the public”). And after Padilla was escorted inside the room, the door was closed behind him.
At that point, the government had successfully isolated Padilla in an unfamiliar environment, another critical fact in the custody analysis. See Beckwith v. United States, 425 U.S. 341, 346 n. 7, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (“[T]he principal psychological factor contributing to successful [custodial] interrogation was isolating the suspect in unfamiliar surroundings for no purpose other than to subjugate the individual to the will of the examiner.”); United States v. Brown, 441 F.3d 1330, 1348-49 (11th Cir.2006) (emphasizing that the interview took place in a “familiar setting” where the defendant “often resided”); United States v. Manor, 936 F.2d 1238, 1241 (11th Cir.1991) (emphasizing that the defendant “selected the location of the meeting and the conversation itself took place in the defendant’s car”). •
Exacerbating Padilla’s confinement in an unfamiliar environment, four armed FBI agents, not customs inspectors, immediately joined him inside the conference room. After closing the door behind them, the FBI agents identified themselves, presented their credentials, and announced their intention to interview Padilla. Four additional FBI agents waited outside. The presence of these FBI agents created precisely the “police-dominated atmosphere” that Miranda was designed to guard against. 384 U.S. at 445, 86 S.Ct. 1602.
The totality of the circumstances described above, largely omitted from the majority’s analysis, establish that Padilla was in custody before questioning even began. But if this conclusion was in doubt, the interview itself would eliminate any question that he was in custody. Agent Fincher began the interview by informing Padilla that his failure to accurately declare the $10,000 was a violation of the law. Although Agent Fincher never told Padilla that he was under arrest, it is unrealistic to suggest that a reasonable person in Padilla’s position would not experience a substantial restriction on his freedom of movement upon being informed by an FBI agent — in an enclosed and isolated room with several other FBI agents, separated from his luggage and $10,000 — that he had just violated the law. Cf United States v. Lunar-Encinas, 603 F.3d 876, 881 (11th Cir.2010) (concluding that the defendant was not in custody in part because the officers “expressly stated at the outset that [the defendant] was not a suspect”).
Moreover, despite informing Padilla of his legal violation, Agent Fincher did not ask Padilla a single question related to the currency over the next hour. Nor did Agent Fincher ask routine booking questions in order to ascertain basic biographical information. Rather, Agent Fincher proceeded to conduct a comprehensive background examination regarding Padilla’s entire life history, from his time grow *1115 ing up in the United States to his time in the Middle East. Although Padilla was cooperative, this line of questioning had no bearing on his currency violation, and it would have therefore suggested to a reasonable person in Padilla’s position that the FBI was looking for additional signs of illegal activity.
Indeed, Agent Fincher asked Padilla at the end of the first hour whether he had used any other names while traveling in the Middle East. Significantly, Padilla responded by asking to call his mother. Even more significantly, Agent Fincher did not allow Padilla to make this call, despite the fact that Padilla had his own cellular telephone and there was a telephone in the conference room. That Padilla even felt obligated to ask permission to make this call confirms that he was already in custody; that Agent Fincher failed to grant the request went so far as to render Padilla incommunicado. See Miranda, 384 U.S. at 457-58, 86 S.Ct. 1602 (“The ... practice of incommunicado interrogation is at odds with one of our Nation’s most cherished principles — that the individual may not be compelled to incriminate himself.”); cf. Brown, 441 F.3d at 1349 (concluding that the defendant was not in custody in part because he was free to use the telephone and did so).
Following a break, Agent Fincher resumed the interview and increased the pressure. Agent Fincher reiterated that Padilla’s currency discrepancy was a violation of the law, and he openly expressed skepticism regarding Padilla’s statement that he did not believe that his failure to properly declare the $10,000 was “a big deal.” Agent Fincher’s increased pressure prompted Padilla to request permission to call his mother for the second time, a request that Agent Fincher again denied. Agent Fincher then “pressed” Padilla about the source and purpose of the $10,000, an issue distinct from Padilla’s failure to accurately declare the currency. And when Padilla failed to provide answers that Agent Fincher deemed adequate, Agent Fincher accused Padilla of not telling the truth.
When analyzed in conjunction with the circumstances preceding the interview, these facts compel the conclusion that Padilla was in custody absolutely no later than this point in time — over two hours after the interview began, but before the second break in the interview, before Agent Fincher accused Padilla of being a terrorist, and, most importantly, before Agent Fincher ceased eliciting the incriminating statements introduced at trial. Accordingly, on this record, I conclude that there was a Miranda violation in this case.
III. Padilla’s Sentence is Substantively Reasonable
Because the majority usurps the authority of a trial judge to decide on a sentence that was “sufficient, but not greater than necessary,” to achieve the statutory sentencing goals, see 18 U.S.C. § 3553(a), I also dissent from the majority’s reversal of Padilla’s sentence. In reversing Padilla’s sentence, the majority fails to adhere to the principles articulated by the Supreme Court and this Circuit requiring appellate courts to accord the trial judge the “considerable discretion” granted district courts in sentencing and to guard against substituting its judgment for that of the trial judge. As this Court has explained:
The district court must evaluate all of the § 3553(a) factors when arriving at a sentence, but is permitted to attach great weight to one factor over others. In assessing the factors, the sentencing court should remember that each convicted person, is an individual and every case is a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the *1116 punishment to ensue. When the district court decides after “serious consideration” that a variance is in order, it should explain why that variance is appropriate in a particular case with sufficient justifications. The justifications must be compelling enough to support the degree of the variance and complete enough to allow meaningful appellate review. But the Supreme Court has specifically rejected the idea that an extraordinary justification is required for a sentence outside the guidelines range. Because of its institutional advantage in making sentence determinations, a district court has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate. We must give its decision due deference. We may vacate a sentence because of the variance only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case. However, that we might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal.
United States v. Shaw, 560 F.3d 1230, 1237-38 (11th Cir.2009) (emphasis added) (internal citations and quotation marks omitted).
The majority, however, concludes that Padilla’s sentence is substantively unreasonable because it “does not adequately reflect his criminal history, does not adequately account for his risk of recidivism, was based partly on an impermissible comparison of sentences imposed in other terrorism cases, and was based in part on inappropriate factors.” As demonstrated below, there is no support in this record for the majority’s stated reasons and thus no support for its conclusion that the trial judge abused its discretion by imposing a below-Guidelines sentence of seventeen and one-half years’ imprisonment.
A. Criminal History
The majority first suggests, in citing 28 U.S.C. § 994(h), that the trial judge improperly discounted Padilla’s criminal history because his sentence was not at or near the top end of his Guidelines range. This record, however, categorically refutes any possible conclusion that the trial judge failed to consider Padilla’s criminal history. The sentencing hearing in this case spanned nine days during which the trial judge heard testimony of several witnesses and considered numerous boxes of documentary evidence and lengthy arguments from counsel. At the conclusion of the evidence, the trial judge explicitly stated that: “Mr. Padilla is the only defendant in this matter with a prior criminal record. He has both a juvenile and adult record. His last conviction occurred just prior to the beginning of the conspiracy.” And later, just prior to rendering Padilla’s sentence, the trial judge again stated: “As to Defendant Padilla, unlike the other two defendants, he has a significant criminal record,” and proceeded to sentence Padilla to a longer term of imprisonment than his two co-defendants.
The majority’s contention that the only appropriate sentence for Padilla is one at or near the high end of the Guidelines range also defies logic. Such a contention violates United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and its progeny by inappropriately treating the Guidelines as mandatory. Indeed, if the trial judge had treated the Guidelines as mandatory, we would be required to reverse the sentence as procedurally erroneous. See Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (explaining that the appellate court *1117 must ensure that the district court committed no significant procedural error such as treating the Guidelines as mandatory). Moreover, such a contention completely ignores Congress’ .mandate to consider, not only criminal history, but all of the history and characteristics of the defendant, as well as the other § 3553(a) factors, before imposing sentence. See 18 U.S.Q. § 3661 (“No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.”).
B. Pre-Trial Confinement
Here, the trial judge appropriately took pains to consider all of the requisite § 3553(a) sentencing factors, not just Padilla’s criminal history, when deciding on a reasonable sentence that was “sufficient, but not greater than necessary,” to achieve the statutory sentencing goals. See 18 U.S.C. § 3553(a). Among other things, the trial judge correctly concluded that a sentence reduction is available to offenders who have been subjected to extraordinarily harsh conditions of pre-trial confinement. See United States v. Pressley, 345 F.3d 1205, 1218-19 (11th Cir.2005). Padilla presented substantial, detailed, and compelling evidence about the inhumane, cruel, and physically, emotionally, and mentally painful conditions in which he had already been detained for a period of almost four years. For example, he presented evidence at sentencing of being kept in extreme isolation at the military brig in South Carolina where he was subjected to cruel interrogations, prolonged physical and mental pain, extreme environmental stresses, noise and temperature variations, and deprivation of sensory stimuli and sleep. In sentencing Padilla, the trial judge accepted the facts of his confinement that had been presented both during .the trial and at sentencing, which also included evidence about the impact on one’s mental health of prolonged isolation and solitary confinement, all of which were properly taken into account in deciding how much more confinement should be imposed. None of these factual findings, nor the trial judge’s consideration of them in fashioning Padilla’s sentence, are challenged on appeal by the government or the majority. Indeed, the majority accepts that our decision in Pressley allows for a sentence reduction to account for the conditions of defendant’s pre-trial confinement, but then asserts that Pressley does not permit a reduction as “extensive” as the one given here. Contrary to the majority’s suggestion, that case did not create a cap on how great a reduction can be in any specific case. Rather, Pressley reaffirms the trial judge’s discretion to consider the unique facts of a defendant’s pre-trial confinement when deciding what weight to give and how to account for those conditions in ultimately imposing the sentence. 345 F.3d at 1219. See also Shaw, 560 F.3d at 1237-38 (explaining that the district court “is permitted to attach great weight to one factor over others” and “has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate”).
The majority fails to identify any clear error, in the trial judge’s decision to vary downward, and instead arbitrarily concludes that the variance was just too much. In blatantly substituting its own view for the discretion of the trial judge, the majority contravenes the well-established principle that “[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.” Gall, 552 U.S. at 51, 128 S.Ct. 586. This principle exists because “[t]he sentencing judge is in a superior position to find facts and judge their import .under *1118 § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record.” Id. (emphasis added) (internal quotation marks omitted). Thus, by declaring, without explanation, that the downward variance the trial judge applied in this case due to the harsh conditions of Padilla’s pre-trial confinement was too “extensive,” the majority impermissibly usurps the discretion of the sentencing judge in direct contravention of clear and unequivocal Supreme Court and Circuit precedent.
C. Future Dangerousness
The majority also concludes that the trial judge erred in determining that Padilla will not pose a high risk of recidivism upon his release from prison when he is in his mid-fifties, and even though he will be subject to a twenty-year term of supervised release. While the majority recognizes that a trial judge may find that recidivism generally decreases with age,[12] it not only rejects that presumption for Padilla, but goes one step further and decides that trial judges may no longer consider, for anyone convicted of a terrorism-related offense, the likelihood that the risk of recidivism will decrease with age. The majority does so, even in the absence of any evidence supporting that conclusion, and even though the government does not challenge on appeal as clearly erroneous the trial judge’s fact-finding that Padilla would be unlikely to engage in new criminal activity when released from prison.[13] See United States v. Irey, 612 F.3d 1160, 1216 (11th Cir.2010) (en banc) (accepting the district court’s finding that the defendant posed a low risk of recidivism upon release because the government never challenged this fact-finding as clearly erroneous).
The majority concludes that because we rejected the presumption that recidivism decreases with age for sex offenders in Irey, we can do the same for those convicted of terrorism-related crimes. The majority’s reliance on Irey for this contention is misplaced for two reasons. First, although the majority in Irey provided numerous reasons why it would, if it could, reject such a presumption for sex offenders, its discussion on this point was merely dicta and admittedly advisory. Irey, 612 F.3d at 1216 n. 35 (“Although we have pointed out for the benefit of sentencing courts in the future the reasons and decisions indicating that the district court’s finding is wrong, because the government has not challenged the factfinding we have expressly accepted the low risk of recidivism finding for purposes of reviewing this sentence.”). Contrary to the majority’s assertion here, Irey did not establish that it is erroneous to find that recidivism decreases with age for sex offenders, because that question was not at issue.
*1119 Second, in Irey, the Court went to great lengths to identify numerous decisions and empirical studies to support its belief that the district court clearly erred in concluding that the defendant in that case, a sexual predator, posed a low risk of recidivism. See id. at 1213-16. Here, other than the majority’s conclusory statement that “Padilla poses a heightened risk of future dangerousness due to his al-Qaeda training,” the majority fails to point to any evidence in the record supporting its rejection of the trial judge’s finding that Padilla is not likely to commit future crimes after twenty years in prison.[14] Rather, the majority simply posits that Padilla will continue to present a special risk of dangerousness because terrorists are “far more sophisticated” than ordinary street criminals. But even if we accept the assertion that terrorism-related crimes are more sophisticated than ordinary crimes, the majority fails to explain, and there is no evidence in this record to show, how the complexity of one’s crime either correlates to or increases one’s future dangerousness.
The one case the majority cites for support only belies its conclusion. In United States v. Meskini, the Second Circuit concluded that Congress had a rational basis to boost the criminal history category'to VI for first time terrorism offenders based on the “likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.” 319 F.3d 88, 92 (2d Cir. 2003). The court in Meskini did not establish a rule that, as a category of offenders, those convicted of terrorism-related offenses will never be able to show that they do not pose a danger to the public due to their advanced age for purposes of evaluating specific deterrence under § 3553(a); To the contrary, the Meskini Court noted that in individual cases, a sentencing court always has the discretion to depart downward When it determines that the criminal history category of VI over-represents the likelihood that an individual defendant charged with a crime of terrorism will commit other crimes in the future. Id. That is what the trial judge did in Padilla’s case and the majority has no principled basis to reject out of hand the fact-finding that Padilla is not likely to commit future crimes when he is released from prison.
D. Unwarranted Disparity Among Similarly Situated Defendants
The majority also unnecessarily “admonishes” the trial judge to avoid re-sentencing Padilla in a manner inconsistent with similarly situated defendants. Despite the majority’s concern that the trial judge failed to consider the differences between Padilla and other offenders charged with acts of terrorism, the record reflects that the trial judge referenced the other terrorism cases to ensure that Padilla be sentenced consistently with any similarly situated defendants. For example, even though Padilla identified and the trial judge noted other offenders who had received shorter sentences for providing material support to terrorists, such as David Hicks (nine months) and Yahya Goba (ten years), the trial judge sentenced Padilla more harshly than those two defendants had been precisely because they were not similarly situated to Padilla. Padilla was sentenced significantly more harshly than those defendants who pled guilty, were convicted of less serious offenses, or who lacked extensive, criminal histories, and yet less severely, than those convicted of more *1120 serious crimes. A trial judge is not precluded from identifying and commenting upon the sentences of other offenders who were charged with less serious crimes, pled guilty, or had less of a criminal history. Indeed that is exactly what the trial judge should do to accommodate as best as possible “the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.” 18 U.S.C. § 3553(a)(6).
The sentences imposed on all three defendants in this case properly reflect this principle. All three defendants were charged with and convicted of the same three offenses. All three had a guidelines range of 360 months to life, from which the trial judge departed downward and imposed a unique sentence on each defendant. The government raises no concerns that Hassoun and Jayyousi received downward departures, even though they both were credited with criminal histories at a level four. As their criminal history scores were two levels below Padilla’s, they both accordingly received lower sentences than Padilla. That Padilla’s sentence was not significantly greater than Hassoun’s most likely resulted from weighing of all other § 3553(a) factors, in particular the unique and extremely harsh conditions of Padilla’s pre-trial confinement.
E. Absence of Personal Harm or Targeting of the United States
Finally, the majority faults the trial judge for remarking that the defendants’ crimes did not personally harm anyone nor target the United States. It is a complete misreading of the record to suggest that the trial judge reduced Padilla’s sentence on this basis. The trial judge’s comments were made as general remarks applicable to each of the defendants, and were never given as a reason to depart downward. Rather, in rejecting the defendants’ contention that they had been overcharged, the trial judge noted that the defendants’ “behavior is a crime,” and characterized the crimes as “very serious.” Finally, just prior to announcing the terms of imprisonment for each defendant, the trial judge reiterated that “[t]he sentences that I announce today do reflect the seriousness of the offense and each defendants’ culpability in criminal conduct. I have already discussed the seriousness of the offenses and each defendants’ culpability.” The trial judge further explained that the sentences will serve to inform others that conspiracy to murder, maim, and kidnap abroad will not be tolerated in this country and the fact that the activities were directed overseas does not excuse them and indeed warrants incarceration. Given the trial judge’s numerous references to the seriousness of the crimes in this case, it can hardly be reversible error also to recognize what the crimes did not entail.
Much of what the majority takes issue with concerns the trial judge’s discretion in weighing the § 3553(a) factors, but the record simply cannot support the conclusion that Padilla’s sentence involves an abuse of such discretion. Precedent from the Supreme Court and this Circuit recognize that trial judges may “attach great weight to one factor over others,” and “remember that each convicted person is an individual and every case is a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.” Shaw, 560 F.3d at 1237-38 (citations and alterations omitted). The trial judge followed these principles such that her conclusion to sentence Padilla below the Guidelines is entitled to “due deference,” even by those who “might reasonably have concluded that a different sentence was appropriate.” Id. at 1238 (citations omitted).
IV. Conclusion
The old adage that “hard facts make bad law” is clearly evident here. First Agent *1121 Kavanaugh’s opinion testimony should have been excluded because he was never qualified as an expert and did not have the requisite first-hand knowledge to offer his lay opinion. His lay opinion testimony was merely the government’s closing argument in disguise. Second, the incriminating statements Padilla made prior to being read his Miranda rights should have been suppressed, because, under the undisputed facts in this record, it is beyond peradventure that Padilla was in custody at the time he made them. Finally, the sentence imposed on Padilla should not be disturbed by this Court, because doing so simply substitutes this Court’s sentencing judgment for that of the trial judge, in whom that authority inheres.

. Although it is possible that these two errors might be considered harmless, the government makes no substantial argument or showing that these significant errors of law are harmless in this case.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions handed down by the Fifth Circuit before October 1, 1981.

. It is clear that under the 2000 Amendment to Rule 701 which added subpart (c) to the rule, and this Circuit’s subsequent precedent, see United States v. Dulcio, 441 F.3d 1269, 1275 (11th Cir.2006), that law enforcement officers now cannot testify under Rule 701 should they wish to offer opinion testimony that is based on their years of law enforcement experience, but must instead be qualified as an expert under Rule 702. Even prior to Dulció, this Circuit generally required a law enforcement officer’s testimony about the modus operandi of drug smugglers and the meaning of coded language in conversations to qualify as expert and not lay opinion when derived from their years of experience. See e.g., United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir.2006) (permitting DEA agent to testify as an expert about the structure of drug trafficking organizations and the use of coded language); United States v. Chastain, 198 F.3d 1338, 1348-49 (11th Cir.1999) (holding that a federal agent who had been a pilot for twenty-one years, was a flight instructor, had spent ten years in the United States Customs Service investigating drug smuggling, and had testified six previous times as an expert on drug smuggling by plane was qualified to offer his expert opinion on general techniques of drug smugglers).

. Although the officer’s nineteen years of experience would no longer be a permissible basis to support his lay opinion under the 2000 Amendments to Rule 701 that preclude lay opinions that are based on "scientific, technical, or other specialized knowledge,” see Dulció, 441 F.3d at 1275, there is no dispute that the officer in Myers saw firsthand the burn marks on the victim’s back and could render a lay opinion based on his personal perception of this injury.

. Although the jury might have determined for themselves that the defendants were trying to hide the real meaning of their conversations, Agent Kavanaugh testified for many days in great detail about many of the conversations under the authority of his status as the FBI’s lead case agent on this case. More importantly, regardless of whether the jury could have reached conclusions similar to Agent Kavanaugh’s, a question which would be considered in an analysis of harmless error, the legal question about the admissibility of his testimony under Rule 701 boils down to the principle that a law enforcement officer cannot testify about his view of the evidence *1109 just because he spent a lot of time investigating the case.

. The court in Novaton also noted the officers’ years of experience in other drug-related investigations as another factor tending to support their lay opinion about the meaning of coded language. 271 F.3d at 1008-09. However, the court explained in a footnote that, under the 2000 Amendment to Rule 701, it could well be that "the experiences which provided the testifying agents with a basis for *1110 rationally perceiving the information provided in their opinion testimony in this case would constitute 'specialized knowledge,' and that such testimony would now be admissible only under Rule 702.” 271 F.3d at 1009 n. 9. The court in Novaton however, did not answer that question because the pre-amendment version of Rule 701 was applicable. ,

.The majority’s contention that Agent Kavanaugh linked the defendants’ calls to checks, wire transfers, and other discrete acts of material support is equally unavailing because, like the transcripts of the telephone calls, the checks, wire transfers, and other discrete acts were also in evidence. Thus, it was the jury’s role to draw reasonable inferences from the evidence before it.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The majority relies on language in United States v. Moya, 74 F.3d 1117, 1120 (11th Cir.1996), suggesting that a border interrogation must rise to a "distinctly accusatory” level before Miranda warnings must be given. Moya, however, involved only routine administrative questioning at the border by immi *1113 gration officers for the purpose of determining the defendant’s admissibility into the country. Id. at 1118-19. It therefore does not resemble the FBI’s interrogation in this case, which was designed to obtain incriminating information. In any event, our precedent clarifies that whether the substance of a border interrogation was accusatory is only one factor to consider in the totality-of-the-circumstances analysis; see United States v. McDowell, 250 F.3d 1354, 1362-63 (11th Cir. 2001); and, as explained below, th,e FBI’s interrogation in this case became accusatory well before Agent Fincher ceased eliciting incriminating statements subsequently introduced at trial.

. As noted by the magistrate judge in his report and recommendation, a comparison of the testimony given by the various law enforcement officers at the suppression hearing reveals several material discrepancies. I nonetheless describe the facts in the light most favorable to, the government.

. While the district court made no finding regarding Padilla's luggage, the record nonetheless reflects that the government retained it following the secondary examination and this is but one of the many factors supporting the conclusion that Padilla was in custody.

. See e.g., United States v. Cavera, 550 F.3d 180, 219 n. 4 (2d Cir.2008) (Sotomayor, J., concurring and dissenting in part) (citing a 2004 recidivism study of the United States Sentencing Commission for the proposition that there is an inverse relationship between age and recidivism).

. The government makes only a passing and conclusory reference to recidivism on the last page of its brief without specifically addressing the sentencing court’s fact-finding. The totality of the government’s argument regarding recidivism is the following: ”[T]he risk of recidivism upon release is very real. That risk is greater because Padilla has literally learned to kill like a terrorist.” Even if this brief statement is construed as a challenge to the trial judge's fact-finding that Padilla is not likely to commit future crimes when released from prison in his mid-fifties, the government's argument fails to explain why Padilla should be presumed dangerous after serving a seventeen and one-half years’ sentence and remaining subject to an additional twenty years of supervised release.

. Even though the majority points to the fact of Padilla’s al-Qaeda training, there is nothing in this record to show how his training correlates to his future dangerousness sufficient to render the trial judge's fact-finding regarding Padilla's risk of recidivism after his term of imprisonment clearly erroneous.